STRYKER CORPORATION and
Osteonics Corporation,
Plaintiffs–Appellees,

v.

INTERMEDICS ORTHOPEDICS, INC.,
and Marli Medical Supplies, Inc.,
Defendants–Appellants.

No. 96–1082.

United States Court of Appeals,
Federal Circuit.

Sept. 25, 1996.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Dec. 6, 1996.

John A. Diaz, Morgan & Finnegan, L.L.P., New York City, argued, for plaintiffs-appellees. With him on the brief were Robert E. Paulson, Harry C. Marcus, Michael A. Nicodema, Christopher A. Hughes, James W. Gould, and Andrea L. Wayda. Of counsel was Mark J. Abate.

Robert L. Baechtold, Fitzpatrick, Cella, Harper & Scinto, New York City, argued, for defendants-appellants. With him on the brief was Steven J. Bosses. Of counsel on the brief were Peter G. Dorflinger and David S. Wise, SULZERmedica USA, Inc., of Angleton, TX, and Larry C. Jones, Bell, Seltzer, Park & Gibson, of Charlotte, NC. Of counsel was Raymond R. Mandra.

Before PLAGER, SCHALL, and BRYSON, Circuit Judges.

SCHALL, Circuit Judge.

Intermedics Orthopedics, Inc. ("Intermedics") and Marli Medical Supplies, Inc. ("Marli") ("appellants") appeal from the judgment of the United States District Court for the Eastern District of New York in *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 891 F.Supp. 751 (E.D.N.Y.1995). Stryker Corporation ("Stryker") and Osteonics Corporation ("Osteonics") ("appellees") sued Intermedics and Marli for infringement of claims 8, 10, and 12 of United States Patent No. 4,888,023 ("the '023 patent"), assigned to Osteonics, a subsidiary of Stryker. 891 F.Supp. at 762. Following a bench trial, the district court held that (1) the '023 patent was not invalid; (2) appellants had infringed the '023 patent, both literally and under the doctrine of equivalents; (3) the infringement was willful; (4) appellees were entitled to double lost profits damages and attorneys fees; and (5) appellees were entitled to injunctive relief. In total, appellees were awarded over $72 million in damages, attorneys fees, and interest through August 31, 1995. *Stryker Corp. v. Intermedics Orthopedics, Inc.,* No. CV-90-3006 (ADS) (E.D.N.Y. October 3, 1995) (amended judgment order). Intermedics and Marli appeal only the finding of willful in-

fringement and the award of damages. We affirm.

## BACKGROUND

The '023 patent covers an invention related to an implant, or prosthesis, that replaces part of the natural hip joint in total hip replacement. The hip joint is composed of two bones, the hip bone and the thigh bone. The thigh bone is more scientifically known as the femur. The hip joint is a ball and socket joint, with the ball at the top end of the femur and the socket in the hip bone. The ball of the femur is also known as the head of the femur. The socket of the hip bone is called the acetabulum. Thus, the acetabulum is "the cup-shaped socket in the hipbone that receives the head of the thigh bone." *Webster's Third New International Dictionary* 14 (1986). The two major components of an artificial hip prosthesis are the new acetabulum, the acetabular prosthesis, and the new femoral head, the femoral prosthesis.

The '023 patent is directed to the femoral prosthesis of a total hip replacement prosthesis, i.e. the component that is inserted into the femur. The femoral prosthesis is comprised of a ball, a stem, and an intervening affixation wedge. The femoral ball or head fits into the patient's pelvis or into a cup element attached to the patient's pelvis. The wedge is designed to seat in the upper end of the patient's femur. The stem extends downwardly from the wedge and is designed for insertion into the medullary canal of the femur. The '023 patent is concerned solely with the femoral element, and in particular, with the stem portion thereof.

Illustratively, Fig. 1 of the '023 patent, reproduced below, shows a femoral prosthesis 20 with a stem 22 inserted in the femur 10. It has a femoral head 28 for engagement with the patient's pelvis. The wedge with affixation surface 38 is seated in cavity 36 of the femur. The stem 22 is inserted in passage 32.

FIG. 1

As found by the district court, and referring again to Fig. 1, "[a]mong the key features of the '023 patent is a distal (lower end) tip [40] adapted for engagement with the

prosthesis's stem [22] by means of complementary tapers."[1] *Stryker,* 891 F.Supp. at 761. The '023 patent abstract describes the distal tip [40] as "selectively removable and replaceable to enable a choice of size combinations in the joined stem and distal tip of the prosthesis." Thus, the '023 patent discloses a femoral prosthesis that is not a single piece prosthesis, but preferably comprised of a joined stem and distal tip. The patent specification refers to the components as the proximal portion (i.e. the joined stem) and the distal portion (i.e. the distal tip). Col. 2, lines 21–24.

As stated above, Stryker and Osteonics sued Intermedics and Marli for infringement of claims 8, 10, and 12 of the '023 patent. Each of these claims is ultimately dependent upon claim 1, which is the only independent claim of the '023 patent. Claim 1 states as follows:

1. In a stem-type femoral prosthesis for implantation in a resected proximal end of a femur, the prosthesis including a stem to be received within the prepared femur, the stem having a proximal end, an affixation surface adjacent the proximal end for enabling the stem to be affixed in place when seated properly within the prepared femur, and a distal end spaced axially downwardly from the proximal end for reception within a passage created in the wall of the prepared femur, the improvement comprising:

[a] a distal tip integral with the distal end of the stem,

[b] the distal tip being spaced axially downwardly from the affixation surface a distance sufficient to enable seating of the distal tip within harder portions of the bone in the wall of the femur when the affixation surface is properly seated in the prepared femur,

[c] the stem including a shaft portion located between the affixation surface and the distal tip,

[d] the shaft portion having a diameter smaller than the corresponding diameter of the distal tip for enabling flexing in the shaft portion, and

[e] the distal tip having an external peripheral surface for engaging said harder portions of bone to confine the distal tip against transverse movements within the passage upon completion of the implantation, and

[f] a fixation-resistant surface finish on the external peripheral surface for maintaining the distal tip unaffixed to the femur and moveable axially relative to the wall of the femur to permit axial displacement of the distal tip and the distal end in response to forces applied to the prosthesis during use of the prosthesis.

Col. 6, line 56 to col. 7, line 16.

The '023 patent is not limited to a two-piece femoral prosthesis. The specification notes that "[w]hile [the] distal tip may be made unitary with [the] stem, it is preferable that [the] distal tip be removable selectively from [the] stem." Col. 4, lines 47–49. The distal tip attaches to the stem by means of complementary tapers, col. 4, lines 51–63, and in a preferred embodiment of the '023 invention, "a series of distal tips [is] offered in a range of outside diameters, so that a surgeon may choose the [distal tip] diameter" that best fits the patient's femur. Col. 4, lines 63–68. The district court found that the interchangeability of the distal tips on the stem is called "modularity" in the hip-implant industry. *Stryker,* 891 F.Supp. at 764.

Since 1988, Osteonics has manufactured and supplied a femoral prosthesis known as the Omniflex, which is the commercial embodiment of the prosthesis of the '023 patent. Since January of 1990, Intermedics has manufactured and supplied a femoral prosthesis known as the APR II. *Id.* at 762. The APR II has a distal sleeve which engages with the stem by means of a complementary taper. *Id.* at 761. The APR II could be installed, however, with or without the distal sleeve. *Id.* at 765. During the period January 1990 through August 1995, Intermedics sold 20,-966 APR II stems, but sold only 4,718 APR II distal sleeves. Over 16,000 sales of the

---

1. The distal end, or tip, of the stem is the lower prosthesis end; it is the end that is inserted into the femur. The upper end of the prosthesis stem is referred to as the proximal end; it is the end that is inserted into the pelvis or is closest to the pelvis.

APR II, therefore, did not result in the APR II with a distal sleeve being implanted into a hip-implant patient.[2]

In the infringement suit, Stryker and Osteonics charged Intermedics and Marli, an Intermedics distributor, with literal infringement and infringement under the doctrine of equivalents. Appellees alleged that the infringement was willful and sought damages, treble damages, injunctive relief, and attorneys fees pursuant to 35 U.S.C. §§ 284, 285 (1994). *Id.* at 762. Intermedics and Marli denied the allegations of infringement and asserted that the '023 patent was invalid and unenforceable. *Id.*

As part of its conclusions and findings as to infringement, the district court determined that the APR II's distal sleeve was a "distal tip integral with the distal end of the stem," as claimed by the '023 patent. *Id.* at 791. The court found that the APR II infringed the '023 patent, both literally and under the doctrine of equivalents. *Id.* at 791–92, 796–97. The district court found that the infringement was willful, based in part upon the finding that Intermedics had copied either (i) the ideas or design presented in the '023 patent or (ii) the Omniflex commercial embodiment. *Id.* at 813–17. It found that Stryker and Osteonics were entitled to lost profits damages. *Id.* at 817–32. In light of Intermedics' willful infringement, and after considering aggravating and mitigating factors with respect to that conduct, the court awarded appellees doubled lost profits damages, attorneys fees, and injunctive relief. *Id.* at 833–35. In so doing, the court did not limit its award of damages to only those APR II stems implanted with a distal sleeve. *Id.* at 817–32. Finally, the court rejected Intermedics' and Marli's arguments that the '023 patent was invalid and unenforceable. *Id.* at 797–813.

## DISCUSSION

### I. Standard of Review

As noted above, the only two issues on appeal relate to the district court's finding of willful infringement and its award of damages. The court's finding of willful infringement is one of fact, subject to the clearly erroneous standard of review. *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1459, 18 USPQ2d 1842, 1847 (Fed.Cir.1991). We must determine whether the district court clearly erred in finding that Stryker and Osteonics met their burden of proving willfulness by clear and convincing evidence. *BIC Leisure Prods., Inc. v. Windsurfing Int'l Inc.*, 1 F.3d 1214, 1222, 27 USPQ2d 1671, 1678 (Fed.Cir.1993). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 76 USPQ 430, 443 (1948); *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1925 (Fed.Cir.1991).

In *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 35 USPQ2d 1065 (Fed.Cir.1995) (in banc), this court summarized the standard of review with respect to a damages issue. The appellant must show that the district court's "determination was based on an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion." *Id.* at 1543, 35 USPQ2d at 1067. This *Rite–Hite* summary, "however, was only intended to be comprehensive and was not intended to overrule the distinction in *SmithKline Diagnostics* [ ] between the clearly erroneous review of the amount of damages and abuse of discretion review of methodology." *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 n. 8, 36 USPQ2d 1540, 1544 n. 8 (Fed.Cir. 1995).

### II. Willful Infringement

The district court based its determination of willful infringement on the findings that

---

**2.** The district court found that the successor to the APR II was the APR II–T. It was introduced in 1992 and embodied certain changes not material to this appeal. The APR II–T "retained the tapered stem and the distal sleeve which 'serves the same purpose as the sleeve made available with the [APR II].' " *Stryker,* 891 F.Supp. at 762. References to both the APR II and the APR II–T will be to the "APR II."

Intermedics (i) deliberately copied the ideas or design of the '023 patent, *Stryker,* 891 F.Supp. at 814–15, and (ii) failed to investigate the scope of the '023 patent and form a good-faith belief that the patent was invalid or that it was not infringed. *Id.* at 815–17. Appellants attack both of these findings.

■ First, Intermedics and Marli argue that the district court clearly erred in finding copying because Intermedics did not make a "slavish copy" of the commercial embodiment of the '023 patent. Appellants contend that the hallmark of previous willfulness findings has been "slavish copying," citing *State Industries, Inc. v. A.O. Smith Corp.,* 751 F.2d 1226, 224 USPQ 418 (Fed.Cir.1985), and that "slavish copying" occurs when the infringing product is virtually an exact copy of the patentee's product or is made using the patentee's product as a template.

We have found no authority in our precedent for the proposition that the fact finder must find "slavish copying" in order to conclude that the infringer copied the patentee's invention. The district court, in summarizing the legal standard for determining willfulness for the purpose of increasing damages, correctly stated that one of the relevant factors is "whether the infringer deliberately copied the ideas or design of another," citing *In re Hayes Microcomputer Products, Inc.,* 982 F.2d 1527, 25 USPQ2d 1241 (Fed.Cir. 1992), and *Bott v. Four Star Corp.,* 807 F.2d 1567, 1 USPQ2d 1210 (Fed.Cir.1986). Neither *Hayes* nor *Bott* holds or states that any copying must be "slavish copying" in order for it to be a relevant factor in determining willfulness. Instead, they respectively state that the inquiry is whether the infringer "intentionally copied the ideas of another," *Hayes,* 982 F.2d at 1543, 25 USPQ2d at 1253, or "deliberately copied the ideas or design of another." *Bott,* 807 F.2d at 1572, 1 USPQ2d at 1213.

Intermedics' reliance upon *State Industries* is misplaced. The court in *State Industries* did discuss "slavish copying," but it did so only to distinguish the case before it from *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 206 USPQ 481 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980).

The *State Industries* court looked at the "totality of the circumstances" in *Milgo,* and noted that "in *Milgo* there was a most elaborate and detailed copying ('slavish copying' according to the trial judge)." *State Industries,* 751 F.2d at 1238, 224 USPQ at 426. Thus, *State Industries* does not require a finding of "slavish copying" in order for copying to be a factor deciding the question of willfulness. We have reviewed the district court's detailed findings of fact with respect to Intermedics copying of Osteonics' invention, *Stryker,* 891 F.Supp. at 786–91, and find no clear error.

■ As noted, appellants also take issue with the district court's finding that Intermedics

> knew of the '023 patent in January, 1990 but failed to investigate the scope of the patent or seek the opinion of competent counsel so that it could form a good faith belief that the '023 patent was invalid or that Intermedics was not infringing with the national launch of the APR II.

*Id.* at 817. The district court correctly summarized the relevant willfulness factor as "whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Id.* at 814 (citing *Hayes,* 982 F.2d at 1543, 25 USPQ2d at 1253, and *Bott,* 807 F.2d at 1572, 1 USPQ2d at 1213). "The law imposes an affirmative duty of due care to avoid infringement of the known patent rights of others. Usually, this duty includes seeking and obtaining competent legal advice before engaging in activity that may result in infringement." *Electro Med. Sys. S.A. v. Cooper Life Sciences,* 34 F.3d 1048, 1056, 32 USPQ2d 1017, 1023 (Fed.Cir.1994) (citations omitted).

The court found that Intermedics had notice of Osteonics' pending patent as of January 23, 1989. *Stryker,* 891 F.Supp. at 816. This finding was based in part on a letter dated January 23, 1989, from J.D. Webb, Intermedics' Manager of Product Development, to Intermedics' patent counsel. In the letter, Mr. Webb sought "consideration of a patent [on the APR II femoral stem and

modular sleeve] and also to insure that we are not infringing on any other patents." *Id.* Attached to the letter was an Osteonics brochure showing a femoral stem with the distal sleeve and marked "U.S. Patent Pending." *Id.*

The court found that Intermedics had actual notice of the '023 patent as of January 5, 1990, when an Intermedics patent attorney, John Merkling, saw a reference to the '023 patent in the Official Gazette of the United States Patent Office, as well as a drawing, on or about that date. *Id.* at 815–16. Despite his knowledge of the '023 patent, however, Merkling did not cause any investigation to be made in January of 1990 as to possible infringement by the APR II, even though he knew that the APR II was Intermedics' first hip implant product incorporating a distal sleeve. *Id.* at 815. In January–February 1990, Intermedics conducted the national launch of the APR II. *Id.*

The clear error of the district court, according to appellants, is that the court did not take account of the "unrefuted, unrebutted evidence of record that in January 1990 Mr. Merkling was not aware that the '023 patent raised an infringement issue." They argue that an affirmative duty on the part of Intermedics "to exercise due care to determine whether or not [it] is infringing," *Underwater Devices Inc. v. Morrison–Knudsen, Inc.*, 717 F.2d 1380, 1389, 219 USPQ 569, 576 (Fed.Cir.1983), could not arise unless Merkling, the attorney, had "actual notice." They argue that "actual notice" requires both knowledge of the '023 patent and knowledge of an infringement problem. They contend that Intermedics did not have "actual notice" because Merkling did not have "actual notice."

In support of their argument, appellants cite *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 225 USPQ 634 (Fed.Cir.1985). In that case, the district court had denied without opinion Shatterproof's motion to increase the damage award. *Id.* at 628, 225 USPQ at 644. On appeal, Shatterproof argued that the record conclusively established that Libbey–Owens Ford ("LOF") had willfully infringed. This court

summarized LOF's counterargument with respect to willfulness as follows:

> LOF responds that its awareness of the patents was only "technical," that its patent staff routinely monitors patent activity in all areas of glass technology, but that its key people on the [infringing] project were not aware of the patents until this litigation arose. LOF contends that it did not have actual notice of the Shatterproof patents, as required in *Underwater Devices....*

*Id.* This court then found no clear error in the district court's decision not to award increased damages. Intermedics and Marli contend that *Shatterproof* supports their argument because in that case the "non-willfulness finding [was] affirmed despite the fact that patent staff discovered patents ... but people on the project were not aware of patents until litigation began."

The argument is flawed. The *Shatterproof* court did not affirm the district court's denial of the motion for increased damages by embracing LOF's argument that its notice of Shatterproof's patents was only "technical," rather than "actual." Instead, it noted that willfulness is a question of fact requiring clear and convincing evidence reviewed for clear error. It affirmed the district court because it could not, based on the record before it, find clear error in the district court's decision. *Id.* It did not affirm based on LOF's "only technical notice" argument, but because of the record before it and the deferential nature of clear error review.

Moreover, appellants have not established clear error with respect to the district court's critical finding of fact. As just noted, the court found that attorney Merkling had knowledge of the '023 patent on or about January 5, 1990, and that "he also knew that the APR II was the first time that Intermedics used a distal sleeve on a hip implant product." *Stryker*, 891 F.Supp. at 815.

Appellants do not challenge the finding that Merkling had notice of the '023 patent. Rather, they claim that Merkling's unrebutted testimony was that he "was *not* aware that the '023 patent raised an infringement issue." In support of this assertion, they cite testimony of Merkling that he was not aware

in January 1990 that Intermedics was *selling* the APR II.

Other record evidence, however, supports the district court's finding that Merkling had knowledge of the APR II. Merkling testified that in January 1990, as a patent attorney, he was charged with responsibilities with regard to intellectual property affairs at Intermedics. An area of Merkling's responsibility was hip stems generally, including all orthopedic patents. He acknowledged ordering a copy of the '023 patent in January 1990, but testified that he could not remember personally receiving the copy he ordered. Intermedics' president, Nick Cindrich, testified that the APR II was "a very hot product, reported at every [Intermedics staff] meeting." When Merkling was questioned about his meetings with Intermedics personnel and about the APR II, his answers were less than direct. His testimony was as follows.

Q. Didn't you testify that you attended regular meetings with [Intermedics] management in or about the—beginning in or about January of 1990, through April of 1990?

A. I made regular visits with [Intermedics] and talked to various people.

Q. And nobody ever mentioned the APR II project?

A. Not particularly, no.

Q. How about generally?

A. I was not familiar with the APR II [on or about] January 5, 1990, to the best of my recollection.

Based on the record before us, we cannot say that the district court clearly erred in finding that Merkling had knowledge of the APR II and its distal sleeve at the time he had actual knowledge of the '023 patent. As appellants have failed to establish clear error in the district court's fact findings with respect to the relevant willfulness factors, they have failed to demonstrate that the district court erred in finding willful infringement.

## III. Damages

■ Appellants raise two issues with respect to the district court's award of damages. First, they contend that the court erred as a matter of law when it awarded damages for sales of APR II stems that never were implanted in patients with distal sleeves. As noted above, the APR II could be implanted in a patient with or without a distal sleeve. During the period January 1990 through August 1995, Intermedics sold 20,966 APR II stems, but sold only 4,718 APR II distal sleeves. Over 16,000 sales of the APR II, therefore, did not result in the APR II with a distal sleeve being implanted in a patient.

According to appellants, it was wrong for the district court to award damages for all sales "without regard to whether they infringed or did not [infringe]." Appellants assert that there was no infringement until a distal sleeve was connected to an APR II stem, and that "[s]ince sleeveless stems do not infringe, it was an error of law to award damages for their sales."

We find no error in the district court's decision to award damages for APR II stems implanted without the distal sleeves. The court noted that 35 U.S.C. § 271(a) (1994) provides in relevant part that "whoever without authority makes, uses or sells any patented invention ... infringes the patent." *Id.* at 766. The court's damages decision was based upon its finding that Intermedics and Marli had infringed "by reason of their manufacture, use and/or sale of each of the APR II ... hip prostheses." *Stryker Corp. v. Intermedics Orthopedics, Inc.,* No. CV–90–3006 (ADS) (E.D.N.Y. October 3, 1995) (amended judgment order).

In its damages analysis, the district court examined how Intermedics manufactured, used, and sold the APR II. It found that Intermedics always manufactured the APR II with a sleeve option. *Stryker,* 891 F.Supp. at 822. The APR II was marketed as a total system, including the distal sleeves. *Id.* The district court excerpted the testimony of an APR II sales agent with respect to how the APR II systems were sold. *Id.* at 822–23. The sales agent would attempt to sell the entire APR II system to a surgeon. *Id.* at 822. In most circumstances, the final decision of whether or not to install the APR II with the distal sleeve was made in surgery. *Id.* Because of the timing of this decision, the surgeon needed the entire sys-

tem in the operating room and a responsible APR II sales agent would make sure that the sleeves were available in the operating room for the surgeon. *Id.* at 822–23. An orthopedic surgeon also testified that the entire system—the APR II and its distal sleeve—would be available in the operating room for the surgeon to implant. *Id.* at 823. In explaining the decision to award damages for all APR II sales, the court stated:

> Intermedics contends that [Osteonics] has not shown that the APR II was selected by surgeons because of its sleeve option. According to [Intermedics], most of the surgeons do not use the sleeve when implanting the APR II, and sleeve usage with the APR II is currently in the 12 to 15 percent range. Moreover, the defendant claims that it markets the APR II by stressing a variety of its features. . . .
>
> The Court is unpersuaded by [Intermedics'] contentions, because they are belied by [its] own marketing and sales strategy—among other evidence—which emphasize selling the APR II as one unit [with a distal sleeve]. Indeed, the APR modular distal sleeve was the key functional feature of the APR II, because without it [Intermedics'] representations about the APR II's ability to ... fit and fill the bone cavity would have been rendered meaningless. (See Tr. at 1267 [one of the "biggest selling features" of the APR II is the distal sleeve]; Tr. at 1034 [the ability to make the advertising claim of "fit and fill" or "fit without forfeit" could not be made without the APR II distal sleeve] ).

*Id.* at 821–22. In addition, the district court noted that Intermedics' surgeon customers had testified that a factor in their decision to purchase and install the APR II was that the APR II could be installed with a distal sleeve. *Id.* at 824–25.

The district court correctly stated the legal standard that "[t]o recover lost profit damages, 'the patentee must show a reasonable probability that, "but for" the infringement, it would have made the sales that were made by the infringer.'" *Id.* at 818 (quoting *Rite–Hite*, 56 F.3d at 1545, 35 USPQ2d at 1069). It also noted that this court held in *Rite–Hite* that the "but for" test must be read in light

of the "reasonable limits of liability" and that damages thus must be based upon "'a particular injury that was or should have been reasonably foreseeable by an infringing competitor in the relevant market,' absent a persuasive reason to the contrary." *Id.* at 819 (quoting *Rite–Hite*, 56 F.3d at 1546, 35 USPQ2d at 1070). In support of the district court decision, Stryker and Osteonics argue as follows:

> [Intermedics] contends it should only have to compensate Osteonics for the loss of 4,718 Omniflex sales because that is the number of times the surgeons infringed by using both the stem and sleeve components of the APR II system in surgery. However, that ignores the fact that Osteonics lost a sale each of the 20,966 times that [Intermedics] supplied the surgeons with the infringing APR II system. Osteonics did not lose a sale only when the surgeon determined it was "medically appropriate" to [implant the stem and sleeve] when implanting the APR II prosthesis; it irretrievably lost a sale each time the surgeon went into the operating room with the "full complement" of APR II system components.

In sum, appellees contend that appellants are liable by reason of their infringing manufacture, use, and/or sale of the APR II systems *supplied* for surgeries.

We agree and find no error in the district court's decision to award damages for all APR II sales. It can properly be said that appellants damaged appellees each time they supplied an APR II system, complete with a distal sleeve, to a surgeon. Once the APR II system was supplied to a surgeon, Osteonics lost the opportunity to make the sale. It does not matter if the surgeon installed the APR II stem without the distal sleeve because the compensable injury had already occurred—when the APR II was supplied to the surgeon instead of the Omniflex. Put another way, by supplying the APR II to surgeons, appellants kept the Omniflex out of the operating room.

■ The second issue raised by appellants with respect to the district court's damages award relates to the court's application of the four-factor test for lost profits set

forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978). The four *Panduit* factors the patentee must establish are: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit the patentee would have made. *Rite–Hite*, 56 F.3d at 1545, 35 USPQ2d at 1069. In awarding lost profits, the district court extensively analyzed the evidence and arguments and found that Stryker and Osteonics had established each *Panduit* factor. *Stryker*, 891 F.Supp. at 819–28. Appellants do not challenge the district court's findings with respect to the first, third, or fourth *Panduit* factors; they only challenge the court's finding as to the second factor. The court found that "there were no acceptable non-infringing substitutes available at the time of the initial infringement and throughout the period of infringement claimed in this case." *Id.* at 825.

Appellants argue that the district court's definition of acceptable non-infringing alternatives was too restrictive. They assert that the court defined "acceptable alternatives" as those devices which employed the patented invention—a stem with a modular distal tip. In other words, appellants say the district court defined as "acceptable" only those devices which infringe. According to appellants, this approach was wrong; given a proper range of acceptable non-infringing alternatives, there is "compelling evidence" to show that Intermedics' APR II sales would not have gone to Osteonics. Appellants claim this evidence includes (i) testimony by surgeons with respect to what they, the surgeons, considered acceptable substitutes to the Omniflex and APR II, and (ii) "[b]oth parties' internal documents [which] identify at least Zimmer, Depuy and Howmedica as competitors for their OMNIFLEX and APR II prostheses."

The contention is without merit. The district court considered the surgeon testimony and the other evidence, and then found as follows:

The Court is not persuaded by the defendant's contentions, and finds that they are contradicted by the defendant's own documents....

According to [Intermedics'] marketing strategies, Intermedics has identified only three primary competitors to the APR II in this market, in addition to the Omniflex. They are the Howmedica PCA–E, the Zimmer Multilock, and the Depuy A.L. However, none of these three competitors' products contains a modular distal tip or sleeve as featured in the '023 patent, the Omniflex and the APR II. In its analysis of each of these competitors' products, Intermedics describes as a weakness their lack of "modularity other than head options." At the same time, [Intermedics recognizes] Osteonics's increase in market share resulting from its capitalization of the emerging trend in distal modularity.

*Id.* at 824. The court then noted this court's statements in *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 21 USPQ2d 1321 (Fed.Cir.1991) that "the mere existence of a competing device does not necessarily make the device an acceptable substitute" and that a "product on the market which lacks the advantages of the patented product can hardly be termed a[n] [acceptable] substitute." *Id.* at 1373, 21 USPQ2d at 1331.

In short, the district court determined that Intermedics' own documents established that the Howmedica, Zimmer, and Depuy devices lacked distal modularity, and thus could hardly be termed acceptable substitutes. Appellants fail to address this finding, however. Instead, they argue that "[b]oth parties' internal documents identify at least Zimmer, Depuy and Howmedica as *competitors* for their Omniflex and APR II prostheses." The district court did not dispute this point. The critical question was not whether there were competing devices, but whether there were acceptable substitutes. Appellants have failed to establish clear error in the district court's finding on that issue.[3]

---

**3.** We also note that the argument that there were acceptable non-infringing substitutes is undermined by the fact that appellants have been found to have willfully infringed the '023 patent. As the *Panduit* court noted, "[t]he 'acceptable substitute' element, though it is to be considered,

## CONCLUSION

For the foregoing reasons, we hold that the district court's finding of willful infringement and its damages award are neither clearly erroneous nor tainted by legal error.

## COSTS

Each party shall bear its own costs.

*AFFIRMED*

must be viewed of limited influence where the infringer knowingly made and sold the patented product for years while ignoring the 'substi-

tute.'" *Panduit*, 575 F.2d at 1162 n. 9, 197 USPQ at 734, n. 9.